[No. D023571. Fourth Dist., Div. One. Nov. 14, 1996.]

CHAPARRAL GREENS et al., Plaintiffs and Appellants, v.
CITY OF CHULA VISTA et al., Defendants and Respondents;
BALDWIN BUILDERS et al., Real Parties in Interest and Respondents.

---

COUNSEL

Charles S. Crandall, Michael R. Harris, Macon Cowles & Associates, Macon Cowles, Susan O'Neill, Rossbach & Whiston and William Rossbach for Plaintiffs and Appellants.

John J. Sansone, County Counsel, Diane Bardsley, Chief Deputy County Counsel, Mark C. Mead, Deputy County Counsel, Bruce M. Boogaard, City Attorney, Ann Y. Moore and D. Richard Rudolf, Assistant City Attorneys, Remy, Thomas & Moose, Tina A. Thomas, James G. Moose, Whitman F. Manley, John H. Mattox and Danae J. Aitchison for Defendants and Respondents.

Gatzke, Mispagel & Dillon, Mark J. Dillon and David P. Hubbard for Real Parties in Interest and Respondents.

---

OPINION

McINTYRE, J.—Baldwin Builders and certain of its affiliates (collectively, Baldwin) submitted to the City of Chula Vista (City) and the County of San Diego (County) (collectively, Respondents) a proposed plan to create a residential community in southwestern San Diego County. Respondents ultimately certified a program environmental impact report (PEIR) for the project under the California Environmental Quality Act (Pub. Resources Code,[1] § 21000 et seq., CEQA). Chaparral Greens and Daniel Tarr (collectively, Chaparral Greens) challenged the certification by filing a petition for peremptory writ of mandate in the trial court. Chaparral Greens contended the resolutions approving the PEIR were void and a new PEIR was needed to address deficiencies in the original; Chaparral Greens also sought an order enjoining the Respondents from issuing any land use or zoning approvals until Respondents complied with the requested writ.

Prior to trial, the court granted motions by Baldwin and Respondents to exclude live testimony by Chaparral Greens' factual and expert witnesses, permitting only declarations and other evidence on specified subjects. After three days of hearings, the court denied the petition and the related request

---

[1]All statutory references are to the Public Resources Code unless otherwise specified.

for injunctive relief. It subsequently awarded Respondents and Baldwin certain of their costs of suit.

Chaparral Greens appeals, contending (1) the PEIR improperly failed to analyze the adverse impact of the project on certain draft regional species preservation plans that were being formulated at the time the PEIR was drafted; (2) Respondents improperly failed to revise or recirculate the PEIR based on new information that became available after the PEIR was finalized, but before it was certified; (3) the court failed to admit relevant, admissible evidence offered by Chaparral Greens; and (4) the court abused its discretion by imposing costs. We find Chaparral Greens' arguments unavailing and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Otay Ranch is a parcel of approximately 22,509 acres of undeveloped property in southwestern San Diego County. It includes coastal sage scrub habitat and is home to more than 80 varieties of sensitive, threatened or endangered plant and animal species. Based on the biological importance of this property, it is within the area addressed by two regional conservation planning programs being developed in San Diego County: the Multiple Species Conservation Program (MSCP) and the Natural Community Conservation Planning (NCCP).[2]

Baldwin formalized a commitment with Respondents to create a general development plan for Otay Ranch. Respondents determined to jointly plan the use of the property pursuant to a memorandum of understanding, which created an interjurisdictional task force to formulate policy recommendations regarding Baldwin's proposed development of the property. The task force consisted of elected officials, representatives from Baldwin, a community planning group consultant and members of the public, was staffed by planning professionals from both the City and County and private consultants and received input from 11 technical committees that reviewed project alternatives. Respondents designated the City as the lead agency for preparation of the PEIR for the project. The City ultimately hired Ogden to prepare the PEIR.

---

[2] The MSCP is a comprehensive habitat conservation planning program implemented by federal, state and local governments for the preservation of natural communities within an 885-square-mile area in southwestern San Diego County. The MSCP, which was conceived as a means of mitigating the growth-inducing impacts of the City of San Diego's sewer treatment program, began in 1991. Ogden Environmental and Energy Services Co. (Ogden) is the primary consultant for the MSCP.

The NCCP is a state-sponsored program established pursuant to Fish and Game Code section 2800 et seq. It is designed to protect coastal sage scrub habitat in a 6,000-square-mile area in Southern California through regulation of development. The area subject to MSCP jurisdiction is a coastal sage scrub subregion within the NCCP and it was anticipated that, on adoption, the MSCP would constitute the NCCP program for that subregion.

In 1989, Baldwin submitted an application to develop approximately 50,000 dwelling units in 15 villages throughout the project site over a 30- to 50-year period. After the task force's review of the proposal and discussions between Baldwin and Respondents, eight on-site alternatives and four off-site alternatives were developed for analysis in the PEIR.

The draft PEIR, consisting of almost 3,000 pages, was released for public comment in July 1992. The draft included an analysis of the biological resources located at Otay Ranch, based on a series of surveys conducted during the preceding several years. The draft identified significant adverse impacts to these resources and included a set of performance standards for preserving various biological communities. It deferred, however, more de-tailed biological analyses for review in subsequent, site-specific plans for the various components of the Otay Ranch project.

A joint planning commission for the City and County conducted work-shops and site visits relating to the proposed project. The commission began formal deliberations regarding the project in December 1992.

About the same time, the final PEIR was issued. In response to concerns raised to the draft PEIR regarding the analysis of the impact of the project on biological resources, the final PEIR stated: "The Otay Ranch Program EIR must stand on its own, separate from the MSCP and NCCP. A preserve designed for coastal sage scrub on Otay Ranch, based on the MSCP or NCCP, would not necessarily adequately cover all sensitive habitats and sensitive species issues. The basic elements of preserve design were incor-porated into the analysis of the various alternatives in the Program EIR. As these elements are fine tuned in the final [Regional Management Plan] and within the MSCP guidelines, changes to the plan at the [Specific Planning Area] level are required by the Program EIR. In previewing some of the draft guidelines for the MSCP, the Program EIR is generally more restrictive with higher standards for species retention."

In May 1993, the commission voted unanimously to approve the project and to recommend to Respondents that the PEIR be certified. Respondents began project deliberations on June 2, 1993 and thereafter held numerous hearings regarding the environmental feasibility of the project. On October 28, 1993, Respondents certified the PEIR and approved the project on terms somewhat different than that recommended by the commission, to wit, having 23,483 dwelling units, with 11,375 acres designated as a managed preserve and 1,166 acres designated as natural open space. Respondents also

adopted a regional management plan (RMP) to address environmental resource management at Otay Ranch.[3]

During Respondents' consideration of the final PEIR, the MSCP and NCCP developed new evaluative maps and other information establishing the importance of Otay Ranch in regional multispecies preservation efforts. An NCCP scientific review panel released a "Draft Recommendation for Conservation Strategy," which called for restrictions on total interim loss of coastal sage scrub habitat to 5 percent within any one subregion, pending adoption of the final MSCP plan.

In March 1993, the United States Fish and Wildlife Service (Service) designated the California gnatcatcher as a threatened species under the federal Endangered Species Act. The Service also issued a proposed special rule designed to protect the gnatcatcher by precluding development in coastal sage scrub habitat unless various conditions and restrictions, including compliance with NCCP conservation guidelines, were met.

In July 1993, California Department of Fish and Game and the California Resources Agency issued NCCP "Draft Conservation Guidelines" to address interim and long-term strategies for evaluating development projects in coastal sage scrub habitat. These guidelines incorporated the 5 percent cap on interim coastal sage scrub loss for the subregion that included Otay Ranch.

Respondents were informed of these developments in the course of their deliberations regarding certification of the final PEIR. During the deliberation hearings, a number of persons voiced concern that the PEIR needed to be revised to reflect the developments. Respondents did not revise or recirculate the PEIR based on the new information; instead Respondents certified the final PEIR on October 28, 1993. Respondents made findings that the project would have significant, unmitigatable environmental impacts, that no reasonable alternative was superior to the project and could accomplish its objectives, and that, despite the significant impacts, the project was justified based on certain findings of fact and a statement of overriding considerations.

---

[3]The RMP is less restrictive on development of sensitive habitats, including coastal sage scrub, than the County's Resource Protection Ordinance, which is applicable to development of other property within San Diego County.

Chaparral Greens challenged the certification by filing a petition for peremptory writ of mandate on November 29, 1993.[4] The court denied the petition, finding in part that Respondents were not obligated under California Code of Regulations, title 14 (CEQA Guidelines), section 15125 to consider the MSCP and the NCCP since they were merely draft plans and that the PEIR contained an "enormous amount of regional data . . . and the specific discussions regarding the relationship between the project and the regional plans." Chaparral Greens appeals.

DISCUSSION

*CEQA*

■ With certain limited exceptions, CEQA requires the preparation of an environmental impact report (EIR) whenever a public agency proposes to approve or carry out a project that may have a significant impact on the environment. (§§ 21100, 21151; CEQA Guidelines, §§ 15002, subd. (f)(1), (2), 15063; *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*).) The EIR is intended to provide the decisionmaking agencies and the public with detailed information about the impact a proposed project is likely to have on the environment, to outline ways in which that impact might be minimized and to identify alternatives to the project. (§ 21061; CEQA Guidelines, § 15003, subds. (b)-(e).) Thus, the EIR is the " 'heart of CEQA,' " protecting the environment and requiring informed self-government. (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161].)

In accordance with the statutory scheme, the responsible (lead) agency prepares a draft EIR, which is circulated and made available for public comment. The agency then prepares a final EIR, which incorporates comments made to the draft EIR and responds to significant environmental points raised during the review process. (CEQA Guidelines, §§ 15090, 15132, subds. (b)-(d).) Finally, the lead agency certifies the EIR, stating that (1) the final EIR has been completed in compliance with CEQA, (2) it considered the information therein before approving the project, and (3)

---

[4]At trial, Chaparral Greens argued (1) Respondents failed to exercise independent review of the draft and final PEIR's; (2) Respondents violated CEQA by certifying the PEIR before approval of the annexation of Otay Ranch to the City; (3) the statement of overriding considerations was not supported by the evidence; and (4) Respondents violated CEQA by failing to consider the regional environmental studies. Only the final issue is raised on this appeal.

either the significant environmental effects identified in the EIR are being mitigated or the unmitigated effects are outweighed by the benefits of the project. (§§ 21002, 21002.1, 21081; CEQA Guidelines, §§ 15090-15093.)

Where the proposed project " 'encompasses a wide spectrum, ranging from the adoption of a general plan, which is by its nature tentative and subject to change, to activities with a more immediate [site-specific] impact,' " CEQA mandates the use of tiered EIR's. (*Al Larson Boat Shop, Inc.* v. *Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 740 [22 Cal.Rptr.2d 618], citing *Sierra Club* v. *County of Sonoma* (1992) 6 Cal.App.4th 1307, 1315 [8 Cal.Rptr.2d 473]; § 21093, subd. (b).) " 'Tiering' refers to the coverage of general matters in broader EIR's (such as on general plans or policy statements) with subsequent narrower EIR's or ultimately site-specific EIR's incorporating by reference the general discussions and concentrating solely on the issues specific to the EIR subsequently prepared." (CEQA Guidelines, § 15385.) The PEIR certified by Respondents is such a tiered EIR.[5]

*Standard of Review*

Against this backdrop, we must consider Chaparral Greens' arguments that Respondents violated their obligations under CEQA. ■ In so doing, we must defer to Respondents' substantive conclusions, so long as the decisions are "supported by substantial evidence in the light of the whole record" and there was no prejudicial abuse of discretion. (§§ 21168, 21168.5; CEQA Guidelines, § 15091, subd. (b); *Laurel Heights II, supra,* 6 Cal.4th at pp. 1133, 1135; *Del Mar Terrace Conservancy, Inc.* v. *City Council* (1992) 10 Cal.App.4th 712, 725 [12 Cal.Rptr.2d 785]; *River Valley Preservation Project* v. *Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 166 [43 Cal.Rptr.2d 501].) "Determinations in an EIR must be upheld if they are supported by substantial evidence; the mere presence of conflicting evidence in the administrative record does not invalidate them." (*Barthelemy* v. *Chino Basin Mun. Water Dist.* (1995) 38 Cal.App.4th 1609, 1620 [45 Cal.Rptr.2d 688].) Only if Respondents have applied an erroneous legal standard, and thus failed to proceed in a manner required by law, does this court engage in independent review of the

---

[5]CEQA Guidelines, section 15168, subdivision (a) provides for the preparation of a PEIR "on a series of actions that can be characterized as one large project and are related either: (1) Geographically, (2) As logical parts in the chain of contemplated actions, (3) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program, or (4) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways."

application of the statute. (*East Peninsula Ed. Council, Inc.* v. *Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 165 [258 Cal.Rptr. 147].)

### *Failure to Analyze Impact of Project on MSCP and NCCP Programs*

CEQA Guidelines, section 15125 provides:

"An EIR must include a description of the environment in the vicinity of the project, as it exists before the commencement of the project, from both a local and regional perspective. . . .

"(a) Knowledge of the regional setting is critical to the assessment of environmental impacts. Special emphasis should be placed on environmental resources that are rare or unique to that region and would be affected by the project.

"(b) The EIR shall discuss any inconsistencies between the proposed project and applicable general plans and regional plans. . . .

"(c) Where a proposed project is compared with an adopted plan, the analysis shall examine the existing physical conditions as well as the potential future conditions discussed in the plan."

The guidelines recognize that the preparation of an EIR involves a degree of forecasting and that an agency must "use its best efforts to find out and disclose all that it reasonably can." (CEQA Guidelines, § 15144.)

 Pursuant to these authorities, Chaparral Greens contends Respondents violated CEQA in failing to include in the PEIR an analysis of the impact of the project on the regional goals for preservation of multiple species, as reflected in the MSCP and NCCP draft materials.[6] In particular, Chaparral Greens argues that Respondents are obligated to consider all "reasonably foreseeable" impacts from the project, including impacts on the regional planning efforts reflected by the MSCP and the NCCP. It also asserts that, for all intents and purposes, the PEIR fails to discuss or analyze the impact of the project on the MSCP and NCCP regional planning efforts.

---

[6]At all times prior to the certification of the PEIR, the MSCP and NCCP program materials were in draft form. The NCCP issued its draft conservation guidelines in July 1993; those guidelines were formally issued in November 1993. The working draft of the MSCP was issued in December 1993, after the PEIR process had been completed. At the oral argument of this appeal, Chaparral Greens admitted that a final MSCP/NCCP has not yet been adopted.

We begin our analysis by noting that the issue before us is whether Respondents were required under CEQA to consider the MSCP and NCCP, rather than whether we believe it would have been advisable for them to do so. (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278], citing *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396] [a reviewing court "does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document"].) We find Chaparral Greens' arguments unavailing in light of the legislative admonition that the courts should not interpret CEQA to impose "procedural or substantive requirements beyond those explicitly stated in [the statutes or CEQA Guidelines]." (§ 21083.1; cf. *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049] [CEQA is to be interpreted "in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language"].)

██ "CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive." (*Kings County Farm Bureau* v. *City of Hanford* (1990) 221 Cal.App.3d 692, 712 [270 Cal.Rptr. 650], citing CEQA Guidelines, § 15151.) "Basic to environmental review is that it occur early enough in the planning stages of a project to enable environmental concerns to influence the project's program and design, yet late enough to provide meaningful information for environmental assessment. [Citation.]" (*Kings County Farm Bureau* v. *City of Hanford, supra,* 221 Cal.App.3d at p. 738; see also CEQA Guidelines, §§ 15004, subd. (b), 15168, subd. (b)(4).) Agencies are not required to engage in "sheer speculation" as to future environmental consequences of the project. (*Kings County Farm Bureau* v. *City of Hanford, supra,* 221 Cal.App.3d at p. 738.) ██ Similarly, in the case of draft or proposed regional conservation plans, there is no express legislative or regulatory requirement under CEQA that a public agency speculate as to or rely on proposed or draft regional plans in evaluating a project. (See appen. G to the CEQA Guidelines ["A project will normally have a significant effect on the environment if it will: (a) Conflict with *adopted* environmental plans and goals of the community where it is located"], (italics added)].)[7]

Where regional planning processes have not resulted in the adoption of plans or regulations relating to the environment, CEQA requires project

___

[7]Chaparral Greens argues that CEQA Guidelines, section 15125, subdivision (b) requires consideration of project impacts on all "applicable" regional plans, regardless of whether the plans have yet been adopted. Chaparral Greens, however, is trying to create a distinction without a difference. A plan that is in draft form cannot be said to be nonetheless legally applicable, or enforceable, as to a particular project.

applicants and public agencies to engage in an analysis of the impacts of the proposed project on the environment. (§§ 21000, 21002.1, 21003.1, subd. (b), 21080, subd. (d), 21081, 21082.2, subd. (a); see also NCCP process guidelines [recognizing that local agencies' participation or "enrollment" in the draft plans within the region is purely voluntary and that the development of "non-enrolled" land would merely be subject to CEQA compliance].) In the case of the public agency, CEQA also requires a determination that the significant impacts either can be mitigated or are justified by overriding considerations. (§ 21081; CEQA Guidelines, §§ 15091, subd. (a), 15092, subd. (b), 15093.)

Here, the PEIR includes a significant discussion of the environmental impacts of the Otay Ranch project and sets forth required findings about whether those impacts are mitigatable or are supported by overriding considerations. Further, the record establishes that Respondents considered requests to defer the project approval process until adoption of the MSCP and NCCP, but found this alternative not feasible.[8] Respondents have complied with their obligations under CEQA to analyze the impacts of the project.[9]

*Failure to Revise or Recirculate PEIR Based on New Information*

 Chaparral Greens also contends Respondents violated CEQA by failing to revise or recirculate the PEIR based on information that became available after the final PEIR was issued, but before it was certified. It contends that the failure to revise and recirculate the PEIR "deprived the public of meaningful opportunity to comment upon additional adverse environmental effects of [the project]."[10]

 Where new information is added to an EIR between the close of public comment period and certification, recirculation of the EIR for public

---

[8]Respondents' findings of fact and statement of overriding considerations provides: "During the administrative hearings it was recommended by the public and various resource agencies that adoption of the Project be delayed until adoption of an MSCP or NCCP. Such a measure is infeasible because there is no certainty regarding the timeline for adoption of such a plan. In fact, the environmental review for the NCCP/MSCP has only just begun on the proposed Project and the estimates for completion of the NCCP or MSCP range from 2-4 years. The Otay Ranch Project has been in the processing pipeline for over three years. There is a demand in the South County for a wide variety of housing types; the Project intends to assist in meeting that demand. It would be infeasible for economic and planning reasons to delay approval of the Project until adoption of the MSCP/NCCP."

[9]Chaparral Greens has not challenged the existence of substantial evidence to support Respondents' findings.

[10]Chaparral Greens also argues that Respondents failed to properly publicly consider the requests for recirculation. We decline to address this argument, which was raised for the first time in Chaparral Greens' reply brief. (See, e.g., *Tyler* v. *Children's Home Society* (1994) 29

comment is required where the new information is "significant." (§ 21092.1; CEQA Guidelines, § 15088.5, subd. (a); *Laurel Heights II, supra,* 6 Cal.4th at pp. 1126-1130.) New information is not significant unless the circumstances have changed in a way that "deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement." (CEQA Guidelines, § 15088.5, subd. (a)[11]; see also *Laurel Heights II, supra,* 6 Cal.4th at p. 1130 ["new information that demonstrates that an EIR commented upon by the public was so fundamentally and basically inadequate or conclusory in nature that public comment was in effect meaningless triggers recirculation under section 21092.1." The purpose of requiring recirculation is to encourage meaningful public comment], citing *Mountain Lion Coalition* v. *Fish & Game Com.* (1989) 214 Cal.App.3d 1043 [263 Cal.Rptr. 104].)

The question here is whether Respondents' implicit decision not to recirculate the PEIR (i.e., the decision that the new information was not "significant") was supported by substantial evidence. (*Laurel Heights II, supra,* 6 Cal.4th at pp. 1132-1135.) Although Chaparral Greens urges this court to undertake an independent review of this issue, its position is untenable. Only the addition of *significant* new information triggers the need for recirculation under section 21092.1 and thus the agency's first obligation is to determine whether the new information meets this statutory requirement. In this context, a procedural violation cannot exist "unless the [agency's] decision regarding the significance of the new information fails to pass muster under the [substantial evidence] standard of review." (*Laurel Heights II, supra,* 6 Cal.4th at p. 1134.)

Cal.App.4th 511, 526, fn. 8 [35 Cal.Rptr.2d 291].) Further, no allegation in this regard was included in the amended petition for writ of mandate and it does not appear from the record that this issue was otherwise raised before the trial court. Thus, this issue has been waived for purposes of appeal.

[11]CEQA Guidelines, section 15088.5 provides:

" 'Significant new information' requiring recirculation include[s], for example, a disclosure showing that:

"(1) A new significant environmental impact would result from the project or from a new mitigation measure proposed to be implemented.

"(2) A substantial increase in the severity of an environmental impact would result unless mitigation measures are adopted that reduce the impact to a level of insignificance.

"(3) A feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it.

"(4) The draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded."

Chaparral Greens points to the following information as triggering the duty to recirculate the PEIR: (1) the record evidence developed in connection with the MSCP and NCCP studies in December 1992[12]; (2) the Service's listing of the California gnatcatcher as a threatened species (58 Fed.Reg. 16742 (Mar. 30, 1993)) and issuance of a proposed rule relating to the "take"[13] of gnatcatchers in March 1993[14]; and (3) the issuance of the NCCP draft limitations on development in coastal sage scrub habitat in March 1993 and of NCCP draft conservation guidelines in July 1993. Based on our review of each category of new information, we conclude substantial evidence supports the determination that the information was not "significant" within the meaning of CEQA and accordingly Respondents' decision not to recirculate the PEIR for further public comment was appropriate.

1. *MSCP and NCCP Mapping and Evaluative Information*

The PEIR analyzes at length the impact of the proposed project on the habitat at Otay Ranch. Chaparral Greens contends that new mapping and habitat evaluation information produced by the MSCP and NCCP in February of 1993 required recirculation because the information established the impact of the project on MSCP and NCCP regional planning. However, the

---

[12]The trial court excluded from evidence a memorandum offered by Chaparral Greens that was written by a coordinator for the MSCP and NCCP planning efforts. The memorandum expressed concern that Respondents had not adequately addressed multispecies habitat planning and that the project, as planned, would have adverse effects on the MSCP and NCCP preservation efforts. Chaparral Greens contends that the exclusion of this memorandum was error and urges this court to allow the evidence either as an internal agency communication relevant to CEQA compliance within the meaning of section 21167.6, subdivision (e)(10), or as probative extra-record evidence bearing on the accuracy of the administrative record under *Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 578 [38 Cal.Rptr.2d 139, 888 P.2d 1268]. In light of our conclusion that Respondents were not obligated under CEQA to consider the impact of the project on the unadopted regional plans, this evidence is not relevant to either CEQA compliance or the accuracy of the administrative record.

[13]"Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." (16 U.S.C. § 1532.) "Harm" includes "significant habitat modification or degradation where it actually kills or injures wildlife." (50 C.F.R. § 17.3 (1975); *Babbitt* v. *Sweet Home etc.* (1995) 515 U.S. __ [132 L.Ed.2d 597, 115 S.Ct. 2407].)

[14]The proposed rule was issued pursuant to section 4, subdivision (d) of the Federal Endangered Species Act (Act). (16 U.S.C. § 1533(d); 58 Fed.Reg. 16758 (Mar. 30, 1993); 58 Fed.Reg. 65088 (Dec. 10, 1993), codified at 50 C.F.R. § 17.41(b)(2)-(3) (1995).) The rule provides an exception to the Act's prohibition on land-use activities impacting endangered or threatened species where the proposed land-use activities are addressed in an approved NCCP plan and the Service determines that the plan meets and criteria for an "incidental take" permit under the Act.

Respondents object to Chaparral Greens' reference to the rule, which did not become effective until six weeks after the final PEIR was certified. Based on our analysis above, this objection is well taken.

materials merely amplify the information already set forth in the PEIR regarding the significant impacts of the project on biological resources in Otay Ranch.[15]

To the extent the data also indicates that completion of the project will impact as-yet unfinalized regional planning efforts, it likewise does not support the need for recirculation of the PEIR. As discussed above, the regional planning activities were in formative stages at the time the project approval process was pending. Substantial evidence supports the decision that this additional data was not "significant new information."[16] (§ 21092.1.)

## 2. *Listing of the Gnatcatcher and Issuance of the Special Rule*

Chaparral Greens contends that the PEIR is inadequate in that it did not anticipate or discuss "the most important ramification" of the listing of the gnatcatcher as a threatened species: "the prohibition of all development in coastal sage scrub habitat except in conformance with the NCCP Guidelines that were soon to be issued." In this regard, Chaparral Greens asserts that, pursuant to the proposed special rule, Otay Ranch could not be developed in the interim period under any circumstances and that the project would also exceed the 5 percent destruction limit on interim take of coastal sage scrub habitat for the entire subregion.

As framed, this argument suffers from the fatal assumption that Respondents were required to address the impact of the project on the draft MSCP and NCCP materials. More importantly, the issuance of the listing and the proposed special rule have no bearing on the impact of the project on the California gnatcatcher population and habitat in Otay Ranch, which was fully discussed in the PEIR.

[15]A member of the Ogden consultant team for the MSCP testified at the February 3, 1993, joint planning commission hearing that "[t]he data that were used as part of the MSCP are the same data that were used in the EIR evaluation."

[16]At trial, the court excluded from evidence a declaration offered by Chaparral Greens that criticized the PEIR's failure to address the "likely impacts of the project on the NCCP and MSCP processes." The court excluded the evidence based on a finding that Chaparral Greens had not established the declarant's qualifications to render opinions regarding the adequacy of EIR materials. Chaparral Greens argues that the court should have admitted the declaration to establish that Respondents had not considered all relevant information in the PEIR. However, Chaparral Greens does not challenge the basis relied on by the court in excluding the evidence.

### 3. *Issuance of Draft Limitations and Conservation Guidelines*

The issuance of draft materials after the adoption of, but prior to certification of, the final PEIR did not require recirculation of the PEIR. Just as CEQA does not require agencies to prepare an EIR to address unadopted regional plans (or to delay processing a proposed project application pending adoption of such plans), it likewise does not require agencies to revise and recirculate an EIR based on the issuance of drafts of such plans.

Further, the issuance of final restrictions and guidelines after certification did not require action on Respondents' part. Where changes in a project or its surrounding circumstances arise subsequent to the certification of the EIR, a public agency is only required to reopen its approval of the project and prepare a revised EIR in limited circumstances. (§ 21166; CEQA Guidelines, § 15162,[17] subd. (a) [if the project is approved prior to the occurrence of the new information, a subsequent EIR or negative declaration is required only in connection with a subsequent discretionary approval by the agency].) By contrast to the standards requiring recirculation of an EIR where new information becomes available before certification, information appearing after project approval generally does not require a reopening of the approval. (*Fort Mojave Indian Tribe* v. *Department of Health Services* (1995) 38

---

[17]CEQA Guidelines, section 15162, subdivision (a) provides: "When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following:

"(1) Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

"(2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

"(3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

"(A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration;

"(B) Significant effects previously examined will be substantially more severe than shown in the previous EIR;

"(C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

"(D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative."

Cal.App.4th 1574, 1597 [45 Cal.Rptr.2d 822].) In this context, "the interests of finality are favored over the policy of encouraging public comment." (*Laurel Heights II, supra,* 6 Cal.4th at p. 1130.)

Since these materials were not available in final form until after October 1993, when the PEIR was certified, Respondents were not required to reopen their certification of the PEIR on that basis. Also we note that the NCCP and MSCP restrictions and guidelines did not set forth data or otherwise identify any new or more severe environmental impact of the project. (See *Fort Mojave Indian Tribe* v. *Department of Health Services, supra,* 38 Cal.App.4th at pp. 1596-1598.) Respondents' decision not to recirculate or revise the PEIR based on these materials is supported by substantial evidence.

### *Award of Costs*

■ After trial, Respondents and Baldwin sought to recover approximately $50,000 in costs for defending this action. After finding that Chaparral Greens was indigent, the trial court awarded costs of $22,717.59. Chaparral Greens contends that the award of costs was erroneous because (1) the judgment improperly stated that Respondents were entitled to costs as a matter of right rather than on a discretionary basis; (2) the court gave no reasons for its decision other than to say that it was exercising its discretion; (3) Respondents waived their claim for costs by failing to comply with California Rules of Court,[18] rule 232(c); and (4) Baldwin was not entitled to recover costs since the judgment permitted costs only to Respondents.

The parties do not agree on the appropriate application of the costs statutes in the context of a CEQA writ of mandate. Respondents and Baldwin argue they were entitled to costs as a matter of right, while Chaparral Greens contends an award of costs was purely discretionary with the court. Based on the language of the statute, we conclude that Respondents and Baldwin were entitled to recover costs as a matter of right.

We begin our analysis with Code of Civil Procedure section 1032, which governs the recoverability of costs in court proceedings. Code of Civil Procedure section 1032, subdivision (b), provides "[e]*xcept as otherwise expressly provided by statute,* a prevailing party is entitled as a matter of right to recover costs *in any action or proceeding.*" (Italics added.) Pursuant to this language, Respondents and Baldwin are entitled to recover costs as a

---

[18]All rule references are to the California Rules of Court unless otherwise specified.

matter of right if they fall within the definition of "prevailing parties," absent an express statute to the contrary.

Code of Civil Procedure section 1032, subdivision (a)(4) states " '[p]revailing party' includes the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant." The statute goes on to provide "[w]hen any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not . . . ." (*Ibid.*)

Chaparral Greens argues that the determination of a "prevailing party" is discretionary under Code of Civil Procedure section 1032, subdivision (a)(4), whenever purely nonmonetary relief is sought. However, this contention is belied by the statutory language, which indicates that a determination of prevailing party status is discretionary with the court "[w]hen any party *recovers* other than monetary relief." (*Ibid.*, italics added.)[19] Here, it is undisputed that neither party recovered relief, monetary or otherwise. Rather, the situation is that "neither plaintiff nor defendant obtain[ed] *any* relief," which places Respondents and Baldwin within the statutory definition of "prevailing party." (*Ibid.*, italics added.)[20]

Chaparral Greens points out that this leads to the result that a prevailing defendant in a nonmonetary action is entitled to costs as a matter of right, while a plaintiff recovering nonmonetary relief must rely on the discretion of the trial court to recover costs. It urges that, to avoid this result, we should interpret the first sentence of Code of Civil Procedure section 1032, subdivision (a)(4) to apply only to monetary actions. However, the statute itself is

---

[19]*Lincoln* v. *Schurgin* (1995) 39 Cal.App.4th 100 [45 Cal.Rptr.2d 874] and *Texas Commerce Bank* v. *Garamendi* (1994) 28 Cal.App.4th 1234 [34 Cal.Rptr.2d 155], are distinguishable on this basis. In *Lincoln*, the plaintiffs obtained a monetary judgment against the defendants; defendants obtained declaratory relief and prevailed on part of their breach of fiduciary duty claim against the plaintiffs. Since the defendants there did not obtain a net monetary recovery and did not receive a dismissal and since plaintiffs did not fail to obtain any relief against the defendants, the court found that the determination that defendants were prevailing parties was discretionary with the court. Similarly, in *Texas Commerce Bank*, the court found that plaintiffs who prevailed on declaratory relief claims were parties recovering nonmonetary relief and thus were not entitled to costs as a matter of right.

[20]Chaparral Greens correctly notes that the statute refers to "plaintiff" and "defendant" rather than petitioner, respondent or real party in interest. However, in light of the nonexclusive nature of the definitions of these terms in Code of Civil Procedure section 1032, subdivision (a)(1) through (3), this distinction does not appear to be determinative that the first sentence of Code of Civil Procedure section 1032 is not applicable in this context.

unambiguous in referring to "any relief" and thus there is no basis for judicially imposing such a limitation.

Even if the award of costs in this action was discretionary by virtue of Chaparral Greens' indigent status[21] or otherwise, Chaparral Greens has not established that the court abused its discretion in making such an award. By reference to cases addressing the recoverability of costs and attorney fees under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.), Chaparral Greens argues that the trial court had discretion to award costs to Respondents and Baldwin only if it determined the action to be " ' "unreasonable, frivolous, meritless or vexatious." ' " (*Cummings* v. *Benco Building Services* (1992) 11 Cal.App.4th 1383, 1387 [15 Cal.Rptr.2d 53], citing *Christianburg Garment Co.* v. *EEOC* (1978) 434 U.S. 412, 421 [54 L.Ed.2d 648, 656-657, 98 S.Ct. 694].) However, Chaparral Greens cannot point to any authority imposing such additional conditions on the trial court's exercise of discretion in the context of an action under CEQA or its federal counterpart; we decline to interpret the language of Code of Civil Procedure section 1032 or CEQA to so provide.

Chaparral Greens contends that Respondents waived their right to recover costs because they failed to submit a proposed judgment at the time they submitted the proposed statement of decision. Chaparral Greens relies on rule 232(c), which provides "[a] party who has been designated or notified to prepare the statement [of decision] shall . . . prepare, serve and submit to the court a proposed statement of decision and a proposed judgment." The opposing party then has the opportunity to provide objections to the proposed statement of decision or judgment. (Rule 232(d).) If no proposed statement of decision or judgment is submitted in accordance with rule 232(c), the opposing party may prepare the statement of decision and judgment or move the court to order that the statement of decision is deemed waived.

Rule 232 does not provide for a waiver of costs as a result of noncompliance with its provisions and Chaparral Greens has not cited any authority so holding. In contrast, rule 870 sets forth a specific procedure for claiming or challenging a claim for costs. Rule 870 requires a prevailing party claiming

---

[21]Cf. *Fuller* v. *State of California* (1969) 1 Cal.App.3d 664, 670 [82 Cal.Rptr. 78] ("[y]et the [indigent party] may be held chargeable for the costs of the defendant should she be unsuccessful in her action. There are states whose statutes exempt from liability for costs of the opposing party one who is allowed to proceed *in forma pauperis*. California is among those states that do not exempt the unsuccessful indigent party from a judgment for costs . . . .").

costs to file and serve a memorandum of costs; a failure to comply with this requirement waives the right to recover costs. (E.g., *Hydratec, Inc.* v. *Sun Valley 260 Orchard & Vineyard Co.* (1990) 223 Cal.App.3d 924 [272 Cal.Rptr. 899].) There is no contention that Respondents or Baldwin failed to comply with this provision.

Finally, Chaparral Greens contends that Baldwin cannot recover its costs because the judgment signed by the court provided merely that Respondents would recover costs. In light of the court's explanation that its intent was to award costs also to Baldwin and that the omission of Baldwin from the judgment was "inadvertent," we find this argument unavailing.

### DISPOSITION

The judgment is affirmed.

Kremer, P. J., and Work, J., concurred.

Appellants' petition for review by the Supreme Court was denied February 5, 1997.